UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SCOTT GAGNON, a/k/a<br>MISSY GAGNON,<br><br>      Plaintiff<br><br>v.<br><br>CORRECT CARE SOLUTIONS,<br><br>      Defendant | 1:16-cv-00547-GZS |

**RECOMMEDED DECISION ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

In this action, Plaintiff Scott Gagnon, also known as Missy Gagnon, alleges that Defendant Correct Care Solutions acted with deliberate indifference to Plaintiff's serious medical needs while Plaintiff was incarcerated at the Maine Correctional Center.

The matter is before the Court on Defendant's motion for summary judgment. (ECF No. 41.) Defendant filed its motion on July 17, 2017. Plaintiff has not filed a response to the motion.[1]

Following a review of the summary judgment record, and after consideration of Defendant's motion,[2] I recommend the Court grant the motion.

---

[1] Court mail sent to Plaintiff in July and August to Plaintiff's last known address has been returned as undeliverable. Plaintiff has not contacted the Court to update her contact information or for any other purpose since March 2017.

[2] Although Plaintiff has not filed a response in opposition to Defendant's motion as required by Local Rules 7 and 56, the Court "may not automatically grant a motion for summary judgment simply because the opposing party failed to comply with a local rule requiring a response within a certain number of days." *NEPSK, Inc. v. Town of Houlton*, 283 F.3d 1, 7 – 8 (1st Cir. 2002). Instead, courts must assess whether the

## FACTS

The record establishes that beginning in 2012, Defendant has maintained a Gender Identity Disorder/Gender Dysphoria Policy. The Gender Dysphoria Policy J-G-02a is intended to ensure that individuals who are experiencing gender dysphoria issues are appropriately treated. (*Id.* ¶ 2.)

Defendant follows the World Professional Association for Transgender Health guidelines regarding the treatment of gender dysphoria. (*Id.* ¶ 3.) The guidelines provide standards for the health care of transgender individuals. The standards are designed to provide clinical guidance for health care professionals in treating transgender individuals. (*Id.* ¶ 4.)

Pursuant to the policy, when a transgender individual requests an evaluation or medical accommodation, Defendant begins an evaluation process. (*Id.* ¶ 5.) The process initially involves the review of records from community providers and the completion of a psychological evaluation, which could include a clinical interview, mental status exam, psychological assessment, cognitive assessment and the development of treatment recommendations. (*Id.* ¶ 6.)

Defendant also has a Gender Dysphoria Committee that provides consultation regarding treatment available for individuals with gender dysphoria. (*Id.* ¶ 7.) Defendant has a multidisciplinary team that develops an initial treatment plan for discussion with the Gender Dysphoria Committee. (*Id.* ¶ 8.) After the implementation of an individualized

---

moving party has shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

treatment plan, the multidisciplinary team meets periodically to assess the effectiveness of the treatment. (*Id.* ¶ 10.)

Upon intake at the Maine State Prison on January 29, 2013, Plaintiff identified as a transgender person. (Defendant's Statement of Material Facts ¶ 11, ECF No. 43.) Plaintiff, however, did not notify Defendant until April 2015 that she wished to be treated for issues related to gender identity. (*Id.* ¶ 13.) A mental health care provider met with Plaintiff on April 16 and 23, 2015, during which meetings the clinician and Plaintiff discussed issues related to Plaintiff's gender identity. (*Id.* ¶ 14.) On June 2, 2015, Plaintiff requested an evaluation for gender dysphoria. (*Id.* ¶ 16.) Plaintiff was seen and evaluated in June 2015, and subsequently, she began counseling with Dr. Sarah Miller. (*Id.* ¶ 17.) Dr. Miller conducted an extensive clinical interview and follow-up testing, which resulted in a diagnosis of gender dysphoria on July 22, 2015. (*Id.* ¶¶ 19, 20, 23.) Following the diagnosis, Defendant convened a multidisciplinary team to develop a treatment plan. (*Id.* ¶ 25.)

On October 8, 2015, when the treatment team met with Plaintiff to discuss the treatment plan and objectives, Plaintiff agreed to participate. (*Id.* ¶¶ 33 – 34.) Through a dialogue in November and December, Plaintiff expressed her objectives, including a desire to move slowly with transitioning her appearance and with a change in housing. At the same time, Defendant and the Department of Corrections conferred to discuss the appropriate place for Plaintiff to reside as she progressed with the treatment. (*Id.* ¶ 43.)

Plaintiff commenced hormone therapy on July 14, 2016. (*Id.* ¶ 48.) In September 2016, the Department of Corrections transferred Plaintiff to the Maine Correctional Center,

to reside with the female population in a single cell. (*Id.* ¶ 60.) Care providers monitored Plaintiff's hormone levels and adjusted her therapy to ensure steady progress. (*Id.* ¶¶ 62, 66.) During this process, the team declined a request for laser hair removal treatment, but other options were offered to address facial hair removal. (*Id.* ¶¶ 64, 69, 72.) Plaintiff was not exhibiting emotional symptoms of gender dysphoria, suggesting her course of treatment was responsive to that condition. (*Id.* ¶ 71.) While at the Correctional Center, Plaintiff received mental health care approximately two to four times each month, until her release on May 5, 2017. (*Id.* ¶ 88.)

Plaintiff filed her verified complaint on October 28, 2016, shortly after she was transferred to the Correctional Center. (ECF No. 1.) Plaintiff alleged she had fought "for years" with Defendant to assess her as a transgendered individual, but acknowledged that she was seen and assessed after she filed a grievance. (*Id.* at 4.) Plaintiff asserted that even after she filed the grievance, progress with her treatment was slow and "several months" passed before hormone therapy began. (*Id.*)

Plaintiff filed a verified amended complaint on November 25, 2016. In the amended complaint, Plaintiff asserted various allegations regarding the lack of appropriate treatment. (Verified Amended Complaint, ECF No. 11.) When Plaintiff was released in May 2017, the Department of Corrections provided Plaintiff with a 14-day supply of hormone medication to facilitate her transition to the community. (*Id.* ¶ 90.)

## DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir.1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011). If the court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists, and the court must deny summary judgment on the supported claims. Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

### B. Analysis

Defendant argues summary judgment is appropriate because the record does not support a finding that any of its agents was deliberately indifferent to Plaintiff's serious medical needs and because, even if the record could support such a finding, the record does

not support a finding that any such conduct was the product of an unconstitutional custom, policy, or procedure maintained by Defendant. (Motion for Summary Judgment at 15 – 16.)

Defendant's obligation to Plaintiff regarding medical services is governed by the Due Process Clause of the Fourteenth Amendment. Specifically, the Due Process Clause imposes on the states the "substantive obligation" not to treat prisoners in their care in a manner that reflects "deliberate indifference" toward "a substantial risk of serious harm to health," *Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011), or "serious medical needs," *Feeney v. Corr. Med. Servs.*, 464 F.3d 158, 161 (1st Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 – 106 (1976)). To be actionable, a deliberate indifference claim must satisfy both an objective and a subjective standard. *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 497 (1st Cir. 2011).

The objective standard evaluates the seriousness of the risk of harm to one's health. For a medical condition to be objectively "serious," there must be "a sufficiently substantial 'risk of serious damage to [the inmate's] future health.'" *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). A medical need is serious if it has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would recognize a need for medical intervention. *Leavitt*, 645 F.3d at 497; *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991).

The subjective standard concerns the culpability of the defendant. There must be evidence that a particular defendant possessed a culpable state of mind amounting to

"deliberate indifference to an inmate's health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). Deliberate indifference is akin to criminal recklessness, "requiring actual knowledge of impending harm, easily preventable." *Feeney*, 464 F.3d at 162 (quoting *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993)). The focus of the deliberate indifference analysis "is on what the jailers knew and what they did in response." *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 8 (1st Cir. 2002).

Deliberate indifference must be distinguished from negligence. As the First Circuit explained:

> A finding of deliberate indifference requires more than a showing of negligence. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (holding that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987). A plaintiff claiming an eighth amendment violation with respect to an inmate's serious mental health or safety needs must allege "acts or omissions sufficiently harmful to evidence deliberate indifference." *Estelle*, 429 U.S. at 106; *see also Cortes-Quinone v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir.), *cert. denied*, 488 U.S. 823 (1988). Although this court has hesitated to find deliberate indifference to a serious need "[w]here the dispute concerns not the absence of help, but the choice of a certain course of treatment," *Sires*, 834 F.2d at 13, deliberate indifference may be found where the attention received is "so clearly inadequate as to amount to a refusal to provide essential care."

*Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991).

Defendant does not contest that Plaintiff has alleged a serious medical condition that requires medical attention. Instead, Defendant argues that the record will not support a finding of deliberate indifference on the part of any of its agents, or that Plaintiff experienced a constitutional deprivation pursuant to a policy, custom, or practice maintained by Defendant.

Plaintiff asserted her deliberate indifference claim exclusively against the corporate entity, Correct Care Solutions, and not against any individual involved in her health care. Because Defendant can act only through its agents, if Plaintiff cannot demonstrate that one or more individual agents violated her constitutional rights, Defendant cannot be liable as a matter of law, either in a policy-making capacity or in a supervisory capacity. *Morales v. Chadbourne*, 793 F.3d 208, 221 (1st Cir. 2015) (supervisory official's liability for the acts of subordinates depends on supervisor's own action or inaction being affirmatively linked to the behavior of the subordinate, such as where supervisor is a primary violator or direct participant, or fails to act despite notice of a deficiency that may contribute to a constitutional deprivation); *Rodriguez v. Mun. of San Juan*, 659 F.3d 168, 181 (1st Cir. 2011) ("Liability only attaches where the municipality causes the deprivation through an official policy or custom[, such as where] a person with final policymaking authority caused the supposed constitutional injury." (internal quotation marks and citation omitted)); *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 504 (1st Cir. 2011) ("An underlying constitutional tort is required to proceed under a municipal liability theory. Where, as here, there is no constitutional violation by the employees of the municipality, there can be no liability predicated on municipal policy or custom."); *Sanchez v. Pereira-Castillo,* 590 F.3d 31, 49 n.9 (1st Cir. 2009) ("Because we find there to be no underlying constitutional violation ..., the claims of supervisory liability ... must fail.").[3]

---

[3] Recently, in *Glisson v. Indiana Department of Corrections*, 849 F.3d 372 (7th Cir. 2017) (en banc) (6-4), the Seventh Circuit reviewed the entry of summary judgment in favor of a private prison health care entity and considered whether "an organization might be liable even if its individual agents are not." *Id.* at 378. The court held that a genuine issue existed for trial where a state directive had long called for implementation of a policy of coordinated care for chronically ill prisoners; there is an obvious need for

8

The record does not support a finding that anyone involved in Plaintiff's care, through his or her individual actions, violated Plaintiff's constitutional rights. To the contrary, the record evidence establishes that in accordance with Defendant's policy, Defendant, through its agents, developed and implemented an appropriate treatment plan for Plaintiff. More specifically, the record reflects that Defendant's agents diagnosed Plaintiff's condition and provided Plaintiff with care reasonably designed to address Plaintiff's needs.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant Defendant's Motion for Summary Judgment (ECF No. 41), and enter judgment in favor of Defendant.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 22nd day of September, 2017.

---

coordinated care in some circumstances, as exemplified by the plaintiff's circumstances; the defendant was on notice that the absence of a coordinated care policy would result in the occasional violation of the constitutional rights of chronically ill inmates; and the defendant made a deliberate choice not to promulgate a coordinated care policy. *Id.* at 378 – 82. In this case, even if the First Circuit were to adopt the reasoning of the Seventh Circuit in a similar situation, there is no basis for entity liability, given that Defendant promulgated its Gender Dysphoria Policy before Plaintiff came into its care.